# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

### CASE NO 5:15-cv-134

<table>
<tr><td>

UNITED STATES OF AMERICA;
THE STATE OF NORTH CAROLINA
ex rel. DAVID A. MAJURE, M.D.,
CARLA C. MAJURE,

      Plaintiffs,

v.

CAROLINA COMPREHENSIVE HEALTH
NETWORK, PA; STATESVILLE MEDICAL
MANAGEMENT SERVICES, LLC;
MICHAEL A. SMITH; BRIAN GASKILL;
CODEY BROWN; and DR. HARRISON
"GABE" FRANK,

      Defendants.

</td><td>

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

</td></tr>
</table>

**FILED**
CHARLOTTE, NC

NOV 5 2015

**U.S. DISTRICT COURT
WESTERN DISTRICT OF NC**

*QUI TAM* COMPLAINT

*FILED IN CAMERA AND UNDER SEAL*

*JURY TRIAL DEMANDED*

## QUI TAM COMPLAINT

## I.    INTRODUCTION.

This qui tam action alleges violations of the federal False Claims Act, 31 U.S.C. § 3729,

*et seq.*, and the North Carolina False Claims Act N.C.G.S. §§ 1-605 *et seq.*, relating to false claims

and statements/records made to Medicaid and Medicare in relation to medical care provided (or

not provided) in facilities owned, managed, or operated by Carolina Comprehensive Health

Network, PA ("CCHN").  Through the undersigned legal counsel, Bell, Davis & Pitt, PA, *Qui Tam*

Relators Dr. David A. Majure, M.D. and Carla C. Majure (hereafter "the Majures") bring this

action on their own behalf, and on behalf of the United States of America, and the State of North

Carolina, against Defendant CCHN, defendant Statesville Medical Management Services, LLC ("hereafter "SMMS"), defendant Michael A. Smith, defendant Brian Gaskill, defendant Codey Brown, and defendant Dr. Harrison "Gabe" Frank, M.D. (collectively "Defendants").

## II.    JURISDICTION AND VENUE.

1.    This action arises under the laws of the United States of America to redress violations of the federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*

2.    This Court's subject-matter jurisdiction is conferred by 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331, 1345.

3.    The Court has jurisdiction over Defendants' violations of the false claims act statutes of the State of North Carolina pursuant to 31 U.S.C. § 3732(b), because Defendants' violations of the State's laws and their violations of the federal FCA arise from the same transactions and occurrences.  The Court has pendant jurisdiction over Defendants' state law violations because these state law violations and claims, and Defendants' violations of the federal FCA, arise out of a common nucleus of operative facts.

4.    This Court has personal jurisdiction over Defendant CCHN.  Defendant CCHN is headquartered in Statesville, North Carolina, and CCHN's registered place of business is 1503 East Broad Street, Statesville, North Carolina, (zip code 28265).  This Court has personal jurisdiction over CCHN because 31 U.S.C. § 3732(a) authorizes nationwide service of process, and because (1) CCHN has its principal place of business in the Western District of North Carolina; and (2) CCHN has at least minimum contacts with the United States, and can be found in, transacts, or has transacted, business in the Western District of North Carolina.

2

5.     Defendant CCHN regularly provides medical and healthcare services and submits or causes the submission of thousands of claims for payment to federal health care programs, including, Medicare and Medicaid, and accordingly, is subject to the jurisdiction of this Court.

6.     This Court has personal jurisdiction over Defendant SMMS. Defendant SMMS is headquartered in Statesville, North Carolina, and SMMC's registered place of business is 1503 East Broad Street, Statesville, North Carolina, (zip code 28265). SMMC is believed to provide Medicare and Medicaid billing services, and other critical financial and support services for defendant CCHN.

7.     This Court has personal jurisdiction over Defendant Michael A. Smith, who resides in Mecklenburg County, North Carolina.

8.     This Court has personal jurisdiction over Defendant Brian Gaskill, who resides in Huntersville, North Carolina.

9.     This Court has personal jurisdiction over Defendant Codey Brown, who resides in Statesville, North Carolina.

10.     This Court has personal jurisdiction over Defendant Dr. Harrison "Gabe" Frank, who resides in North Carolina.

11.     Venue lies under 28 U.S.C. § 1391(b),(c) and 31 U.S.C. § 3732(a) because the Western District of North Carolina is a district in which one or more of the Defendants can be found, or transacts business, and an act proscribed by 31 U.S.C. § 3729 occurred within this district.

12.     The specific facts, circumstances, and allegations of the Defendants' violations of the False Claims Act, 31 U.S.C. § 3729 *et seq*, have not been publicly disclosed in a civil or

3

criminal suit, nor any administrative civil money penalty proceedings in which the government is already a party.

13.     The Majures are the original source of all information upon which this Complaint is based with regard to Defendants, as that phrase is used in the federal FCA, and they have provided information of the allegations of this Complaint to the United States prior to filing his Complaint.

## III.     THE PARTIES.

14.     Plaintiff/Relator, David A. Majure, M.D. is a resident of Surry County, North Carolina, and a citizen of the United States of America.

15.     Plaintiff/Relator, Carla C. Majure is a resident of Surry County, North Carolina, and a citizen of the United States of America.

16.     Dr. Majure has been licensed to practice medicine since 1998. He has been licensed to practice medicine under the laws of the State of North Carolina since 2001.

17.     Dr. Majure earned a B.S. degree from the Southern Polytechnic State Institute in Atlanta, Georgia. He earned his medical degree from the Bowman Gray School of Medicine at Wake Forest University. Dr. Majure served his residency in Family Medicine at Spartanburg Regional Medical Center.

18.     From 2004 until 2007, Dr. Majure was employed by Northwest Medical Partners, P.A. in Mount Airy, North Carolina, and was engaged in primary-care family medicine.

19.     From 2007 until 2013, Dr. Majure owned and worked at Majure Skincare and Wellness Center, P.A., located in Mount Airy, North Carolina.

20.     Carla C. Majure was an officer/manager of Majure Skincare and Wellness Center, P.A.

4

21. On July 31, 2013, Dr. Majure sold the assets of Majure Skincare and Wellness Center, P.A. to Winchester Medical Management Services, LLC ("Winchester"). Defendant Michael A. Smith is the Manager of Winchester and defendant Codey Brown is the registered agent of Winchester.

22. From July 31, 2013, until January 2014, Dr. Majure was an employee of Carolina Family Medicine & Urgent Care, P.A., one of many corporations controlled by Michael A. Smith.

23. In approximately January 2014, Carolina Family Medicine & Urgent Care, P.A. shifted its employees over to CCHN, and, since that time, Dr. Majure has been an employee of, and has been providing medical services for, CCHN at 348 N South Street in Mount Airy, North Carolina (Zip Code 27030).

24. From July 31, 2013, until January 2014, Carla C. Majure was actively involved in the management of the CCHN facility in Mount Airy, North Carolina. CCHN regularly consults with Carla Majure regarding the management of the CCHN facility in Mount Airy.

25. Defendant CCHN is a multi-million dollar medical corporation organized and existing under the laws of the State of North Carolina. CCHN has its principal place of business is 1503 East Broad Street, Statesville, North Carolina, (zip code 28265). Defendant Michael A. Smith is CCHN's registered agent and is believed to be the owner and Chief Executive Officer of CCHN.

26. Defendant CCHN also owns, operates, and/or manages a number of health care providing facilities throughout North Carolina, including:

(a) Statesville Carolina Pain Management and Statesville Carolina Family Medicine, whose principal place of business is 1503 E. Broad St., Statesville, North Carolina (Zip Code 28625);

5

(b)     Albemarle Family Comprehensive Pain Management and Albemarle Family Medicine/Comprehensive Pain Management, whose principal place of business is 4920 Albemarle Rd., Charlotte, North Carolina (Zip Code 28205);

(c)     Pain Clinic of Shelby, whose principal place of business is 1112 Yancey St., Shelby, North Carolina (Zip Code 28150);

(d)     Cleveland Comprehensive Pain Management and Cleveland Family Medicine/Comprehensive Pain Management, whose principal place of business is 11711 Statesville Blvd., Cleveland, North Carolina (Zip Code 28625);

(e)     Huntersville Carolina Pain Management and Huntersville Carolina Family & Internal Medicine, whose principal place of business is 16511-A Northcross Dr., Huntersville, North Carolina (Zip Code 28078);

(f)     Southport Carolina Family Medicine and Immediate Care and Southport Carolina Beach Family Medicine & Immediate Care, whose principal place of business is 4654 Long Beach Rd. Southport, North Carolina, (Zip Code 28461);

(g)     Leland Carolina Pain Management and Leland Carolina Family Medicine & Immediate Care, whose principal place of business is 509 Olde Waterford Way, Suite 101, Leland, North Carolina (Zip Code 28451);

(h)     Carolina Beach Pain Management and Carolina Beach Family Medicine & Immediate Care, whose principal place of business is 1328 N. Lake Park Blvd., Suite 106, Carolina Beach, North Carolina (Zip Code 28428).

(i)     Right Care, whose principal place of business 348 N South Street in Mount Airy, North Carolina (Zip Code 27030).

6

(j)     Defendant CCHN also operated a facility in Burlington, North Carolina, whose principal place of business was at 1225 Huffman Mill Rd., Burlington, North Carolina (Zip Code 27215). Upon information and belief, this location was closed in October 2015.

27.     Defendant CCHN has a management team (hereafter "Management") that consists of defendants Michael A. Smith, Brian Gaskill, Codey Brown, and Dr. Harrison "Gabe" Frank, M.D.

28.     Defendant Michael A. Smith is personally involved in managing the day-to-day operations of CCHN and its facilities. He is a resident of North Carolina and a citizen of the United States of America.

29.     Defendant Brian Gaskill is believed to be an executive with, and the Director of Corporate Operations for, CCHN. Brian Gaskill is involved in the day-to-day management of CCHN and its facilities and he is a resident of North Carolina and a citizen of the United States of America.

30.     Defendant Codey Brown is believed to be an executive with, and the Chief Operating Officer for, CCHN. Codey Brown is involved in the day-to-day management of CCHN and its facilities and she is a resident of North Carolina and a citizen of the United States of America.

31.     Defendant Dr. Harrison "Gabe" Frank, a physician licensed in North Carolina, is, and at all relevant times was, the Chief Medical Director of CCHN. Dr. Frank is a resident of North Carolina and a citizen of the United States of America.

32.     At all relevant times, Defendants were responsible for and maintained control over the submission of claims to, and of statements and records submitted to, Medicare and Medicaid.

## IV.  MEDICARE.

33.     In 1965, Congress enacted Title XVII of the Social Security Act, which established the Medicare Program to provide health insurance for the elderly and disabled.  Medicare is a health insurance program for people age 65 or older and for people under age 65 with certain disabilities.  Medicare now has four parts: Part A (Hospital Insurance); Part B (Medical Insurance), Part C (Managed Care Plans), and Part D (Prescription Drug Program).

34.     Medicare Part B (Medical Insurance) helps cover outpatient medical care and services, including primary care and diagnostic testing.  Since its creation, the Medicare Program has enabled the elderly and disabled to obtain necessary medical services from medical providers throughout the United States.

35.     The Medicare Program is administered through the United States Department of Health and Human Services ("DHHS") and, specifically, the Centers for Medicare and Medicaid Services ("CMS"), an agency of DHHS.  Much of the daily administration and operation of the Medicare Program is managed through private insurers under contract with the federal government (particularly CMS).

36.     To participate in Medicare, providers must assure that their services are provided economically and only when, and to the extent they are, "medically necessary."

37.     Medical care is "medically necessary" when it is ordered or prescribed by a licensed physician or other authorized medical provider, and Medicare agrees that the care is necessary and proper. Services or supplies that are needed for the diagnosis or treatment of a medical condition must also meet the standards of good medical practice in the local area.

38.     Medicare will not reimburse a practitioner for services that are not reasonable and necessary for the diagnosis or treatment of an illness or injury. 42 U.S.C. §1395y(a)(1)(A).

39. Moreover, claims for services that are insufficiently documented are ineligible for reimbursement by Medicare.

40. Medical services provided at CCHN's facilities fall under Medicare Part B, and Medicare Part B pays the full Medicare-approved amount, except for a patient co-payment, which is the responsibility of the Medicare recipient. Ordering additional diagnostic studies, ordering additional drug screening, and providing medical services by unqualified individuals are means of increasing a facility's charges to Medicare.

41. Medicare is funded by insurance premiums paid by enrolled Medicare beneficiaries and contributions from the Federal Treasury. 42 U.S.C. §1395j. Eligible individuals who are sixty-five or older, or disabled, may enroll in Medicare Part B to obtain benefits in return for payments of monthly premiums as established by DHHS. 42 U.S.C. §§ 1395j, o. However, payments under Medicare Part B are often made directly to service suppliers, such as physicians and their corportions, rather than to the patient/beneficiary. This occurs when the supplier accepts assignment of the right to payment from the patient/beneficiary. 42 U.S.C. § 1395u(b)(6), (h). In that case, the supplier bills the Medicare Program directly.

42. In order to receive payment, a provider, such as CCHN or one of its facilities, was/is required to submit a paper or electronic claim. Once received, the Medicare program assigns each claim a claim control number and either pays or denies the claim.

43. Specifically, Defendants were required to submit claims for reimbursement using Form CMS 1500 ("CMS 1500") in order to bill Medicare. When a CMS 1500 was submitted, Defendants were required to represent and certify that the information contained therein was complete, accurate, and truthful. At all times pertinent to this matter, Defendants were not

9

permitted to submit a CMS 1500 for services they did not perform, or a Form 1500 that contained inaccurate, incomplete, or untruthful representations.

44.     For a CMS 1500 claim to be paid by the Medicare Part B Program, the claims must identify each service rendered to the patient/beneficiary by the supplier by a corresponding code for services listed in the American Medical Association ("AMA") publication called the Current Procedural Terminology ("CPT") Manual. The CPT is a systematic listing of codes for procedures and services performed by or at the direction of the physician or other qualified medical professional. Each procedure or service is identified by a five digit numeric CPT code. Medicare establishes a fee reimbursement under Part B for each procedure described by a CPT code.

45.     Once the Medicare program reviews and adjudicates a claim, it then pays a provider by check mailed to the provider or by electronically wiring funds to the provider's designated bank account.

46.     Defendants had a duty to have knowledge of all statutes, regulations and guidelines, and payment by Medicare was conditioned upon, among other things, the Defendants' compliance with the applicable statutes, regulations, and guidelines.

47.     At all times pertinent to this matter, Defendants understood that they were required to comply with applicable statutes, regulations and guidelines, and that the submitted CMS 1500 must comply with the laws and regulations governing Medicare billing and reimbursements.

## V.     MEDICAID.

48.     The Medicaid Program was enacted by Congress on July 30, 1965, under Title XIX of the Social Security Act. The Medicaid Act, Title 42, United States Code, Section 1396 *et seq.,* established the Medicaid program, which provides medical insurance for individuals whose incomes were insufficient to meet the costs of necessary medical expenses, including children and

10

disabled individuals. The Medicaid program covers, among other things, the cost of outpatient doctor visits, lab tests, and other diagnostic tests.

49. The Medicaid program in the State of North Carolina is administered by the Division of Medical Assistance (DMA) of the North Carolina Department of Health and Human Services. A substantial portion of the DMA budget (more than half) is funded by the United States Department of Health and Human Services (DHHS).

50. Providers furnishing medical services to Medicaid patients must file claims electronically or by paper. Specifically, Defendants were required to submit claims for reimbursement using Form CMS 1500 ("CMS 1500") in order to bill Medicaid. When a CMS 1500 was submitted, Defendants were required to represent and certify that the information contained therein was complete, accurate, and truthful. At all times pertinent to this matter, Defendants were not permitted to submit a CMS 1500 for services they did not perform, or a Form 1500 that contained inaccurate, incomplete, or untruthful representations.

51. Once the Medicaid program has reviewed and adjudicated the claim, payment is made by check mailed to the provider's address. In the alternative, some providers are paid electronically by wiring funds to the provider's designated bank account.

52. The Medicaid claims submitted to DMA include identifying information about the patient, the date and nature of the service provided, the charge for the service provided, identifying information about the provider, and provider certifications.

53. In order for a claim to be paid, the provider must certify, among other things, that the claim is "true, accurate and complete" and that the services for which reimbursement are sought were medically indicated and necessary to the health of the patient and were personally furnished by the provider or by his employee under his personal direction.

11

54.     In general, DMA relies on the claims and certifications submitted by providers, and pays qualified providers at a predetermined rate.

55.     Like the Medicare Program, Medicaid only covers services or supplies that are necessary for the diagnosis or treatment of a medical condition, that is, Medicaid will not reimburse a practitioner for services that are not reasonable and necessary for the diagnosis or treatment of an illness or injury.  42 U.S.C. §1395y(a)(1)(A).

56.     Moreover, claims for services that are insufficiently documented are ineligible for reimbursement by Medicaid.

57.     By participating in the Medicaid Program, Defendants agreed to follow the requirements set forth in the DMA Provider Manual, applicable federal Medicaid law and regulations, DMA regulations and bulletins, and DMA's annual billing guide.

58.     Defendants had a duty to have knowledge of all statutes, regulations and guidelines, and payment by Medicaid was conditioned upon, among other things, the Defendants' compliance with the applicable statutes, regulations, and guidelines.

59.     At all times pertinent to this matter, Defendants understood that they were required to comply with applicable statutes, regulations, and guidelines, and that the submitted CMS 1500 must comply with the laws and regulations governing Medicaid billing and reimbursements.

60.     In each claim submitted by Defendants, they certified the following: that the claim was true, accurate, and complete; that the service billed was the service that was actually performed; that the services listed were medically indicated and necessary to the health of the patient; that the persons who performed the services were appropriately licensed and qualified to perform those services (or appropriately supervised); and that Defendants would keep such records

12

as are necessary to disclose fully the extent of services provided and the amount and/or claim billed.

## VI.    THE FEDERAL AND STATE FALSE CLAIMS ACTS.

61.    The federal False Claim Act provides, in pertinent part, that any person who (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspires to commit a violation of (l) or (2) is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages which the Government sustains because of the act of that person.  31 U.S.C. § 3729(a)(l)(A), (B) and (C).  For purposes of this section of the federal Code, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.  31 U.S.C. § 3729(b)(l).

62.    The North Carolina False Claims Act states "Any person who commits any of the following acts shall be liable to the State for three times the amount of damages that the State sustains because of the act of that person."  North Carolina Gen. Stat. § 1-607(a).  Further, a "person who commits any of the following acts also shall be liable to the State for the costs of a civil action brought to recover any of those penalties or damages and shall be liable to the State for a civil penalty of not less than five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000) for each violation: (1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval[, or] (2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim. *Id.*

## VII. FALSE CLAIMS REGARDING NERVE CONDUCTION AND SINUSSOIDAL TESTING.

63.     From in or about May 2015, until and including the present, CCHN, by and through its Management, knowingly engaged in a continuing policy, practice, and course of conduct to submit false claims to Medicare and Medicaid for the performance of nerve conduction and Sinusoidal testing that was not medically necessary.

64.     It was the express plan and design of CCHN, by and through its Management, to contact every patient with its "pain management" program, more than 2400 patients, and have every "pain" patient come to a CCHN facility so that CCHN could perform multiple nerve conduction and Sinusoidal studies.

65.     To accomplish this plan of conducting nerve conduction and Sinusoidal studies on every "pain" patient, CCHN, by and through its Management, pressured CCHN facilities and CCHN facility managers to ensure that all "pain" patients were having these tests conducted.

66.     For example, on July 1, 2015, CCHN employee Angela Slate sent an email to CCHN facility managers, excluding physician providers—but copying Michael A. Smith, Brian Gaskill, and Codey Brown—in which she told the facility managers, "As you all know, we can go through our pain lists to call the patients to schedule the testing." The email further instructed the facilities to double-book the patients and to conduct at least 12 tests per day with "NO EXCEPTIONS." The email closed by instructing the facility staff to begin calling the patients to schedule testing appointments.

67.     At the same time CCHN was performing these nerve conduction and Sinusoidal studies on its patients, multiple CCHN facilities lacked the resources to have the results of these nerve conduction and Sinusoidal studies interpreted. As a result, many of the results of these nerve conduction studies were never even interpreted.

14

68.     Moreover, CCHN did not have the medical equipment necessary to conduct such nerve conduction studies at each of its facilities, thus CCHN rotated the testing equipment (or contracted for the testing equipment to be available) only on certain days of the month.

69.     CPT code 92546 is the code for the conduction of Sinusoidal vertical axis rotational testing.  CPT code 92547 is the code for the use of electrodes during the Sinusoidal vertical axis rotational testing identified above.  CPT code 93922 is the code for a non-invasive peripheral arterial study.

70.     From in or about May 2015, until and including the present, Defendants would and did cause claims for thousands of units of medically unnecessary or improperly documented diagnostic Sinusoidal testing to be submitted to Medicare and Medicaid—using CPT codes 92946, 92947, and 93922.

71.     From in or about May 2015, until and including the present, Defendants would and did cause claims for thousands of units of medically unnecessary or improperly documented diagnostic nerve conduction testing to be submitted to Medicare and Medicaid—using CPT codes 95921, 95922, 95909, and 92542.

72.     Many of the patients who received these unnecessary tests did not have the requisite symptoms for these studies to be authorized.  Few, if any, of these patient's files and medical complaints had been reviewed by qualified providers before Defendants ordered its employees to begin conducting and billing for these studies on a massive scale.  Specifically, CCHN's billing records indicate that hundreds of patients complained of dizziness and giddiness when the patients, in fact, reported no such medical symptoms.

73.     During the entire month of August 2015, CCHN, by and through its Management, caused the CCHN facility in Mount Airy, North Carolina to bill Medicare and Medicaid for the performance of hundreds of nerve conduction studies.

74.     Despite the fact that CCHN billed Medicare and Medicaid for more than 100 nerve conduction studies at the Mount Airy facility in the month of August 2015, at no point during the month of August 2015 was the testing equipment necessary to conduct such tests ever present at CCHN's facility in Mount Airy.

75.     More specifically, on or about August 28, 2015, Defendants submitted, or caused to be submitted, a claim to Medicare, using CPT codes 95921, 95922, 92546, 92547, 92542, 95909, in the approximate amount of $955 for nerve conduction testing on patient M.P. at its facility in Mount Airy.  No such test/study was actually performed on patient M.P. on this date at this location.

76.     On or about August 28, 2015, Defendants submitted, or caused to be submitted, a claim to Medicare, using CPT codes 95921, 93922, 92546, 92547, 92542, 95909, in the approximate amount of approximately $1000 for nerve conduction testing on patient D.B. at its Charlotte facility.  No such test/study was actually performed on patient D.B. on this date at this location.

77.     On or about August 28, 2015, Defendants submitted, or caused to be submitted, a claim to Medicaid, using CPT codes 95921, 93922, 92546, 92547, 92542, 95909, in the approximate amount of $1086 for nerve conduction testing patient A.B. at its Statesville facility. No such test/study was actually performed on patient A.B. on this date at this location.

78.     On or about August 28, 2015, Defendants submitted, or caused to be submitted, a claim to Medicaid, using CPT codes 95921, 95922, 92546, 92547, 92542, 95909, in the

approximate amount of $821 for nerve conduction testing on patient K.T. at its Mount Airy facility. No such test/study was actually performed on patient K.T. on this date at this location.

79. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicare in the approximate amount $1021 for patient B.G.A. when no such test/study was actually performed on patient B.G.A.

80. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicare in the approximate amount $1021 for patient C.J.A. when no such test/study was actually performed on patient C.J.A.

81. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicare in the approximate amount $1021 for patient A.C.B. when no such test/study was actually performed on patient A.C.B.

82. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicare in the approximate amount $1021 for patient P.S.C. when no such test/study was actually performed on patient P.S.C.

83. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicare in the approximate amount $1021 for patient J.I.C. when no such test/study was actually performed on patient J.I.C.

84. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicare in the approximate amount $1021 for patient C.V.D. when no such test/study was actually performed on patient C.V.D.

85. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicare in the approximate amount $1021 for patient T.L.E when no such test/study was actually performed on patient T.L.E.

17

86. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicare in the approximate amount $1021 for patient W.A.E. when no such test/study was actually performed on patient W.A.E.

87. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicare in the approximate amount $1021 for patient C.L.F. when no such test/study was actually performed on patient C.L.F.

88. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicare in the approximate amount $1021 for patient P.D.F. when no such test/study was actually performed on patient P.D.F.

89. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicare in the approximate amount $1021 for patient F.E.F. when no such test/study was actually performed on patient F.E.F.

90. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicare in the approximate amount $1021 for patient A.M.G. when no such test/study was actually performed on patient A.M.G.

91. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicare in the approximate amount $1021 for patient C.D.G. when no such test/study was actually performed on patient C.D.G.

92. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicare in the approximate amount $1021 for patient T.F.G. when no such test/study was actually performed on patient T.F.G.

93.     In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicare in the approximate amount $1021 for patient H.L.G. when no such test/study was actually performed on patient H.L.G.

94.     In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicare in the approximate amount $1021 for patient R.W.G. when no such test/study was actually performed on patient R.W.G.

95.     In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicare in the approximate amount $1021 for patient R.L.G. when no such test/study was actually performed on patient R.L.G.

96.     In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicare in the approximate amount $955 for patient G.B.H. when no such test/study was actually performed on patient G.B.H.

97.     In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicare in the approximate amount $955 for patient E.L.H. when no such test/study was actually performed on patient E.L.H.

98.     In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicare in the approximate amount $955 for patient L.J.J. when no such test/study was actually performed on patient L.J.J.

99.     In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicare in the approximate amount $955 for patient K.A.K. when no such test/study was actually performed on patient K.A.K.

100. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicare in the approximate amount $955 for patient S.K. when no such test/study was actually performed on patient S.K.

101. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicare in the approximate amount $955 for patient A.C.M. when no such test/study was actually performed on patient A.C.M.

102. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicare in the approximate amount $955 for patient M.M. when no such test/study was actually performed on patient M.M.

103. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicare in the approximate amount $955 for patient D.P. when no such test/study was actually performed on patient D.P.

104. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicare in the approximate amount $1021 for patient K.E.B. when no such test/study was actually performed on patient K.E.B.

105. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicare in the approximate amount $1021 for patient L.K.D. when no such test/study was actually performed on patient L.K.D.

106. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicaid in the approximate amount $1121 for patient B.B. when no such test/study was actually performed on patient B.B.

107. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicaid in the approximate amount $1121 for patient B.A.C. when no such test/study was actually performed on patient B.A.C.

108. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicaid in the approximate amount $1121 for patient K.D.C. when no such test/study was actually performed on patient K.D.C.

109. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicaid in the approximate amount $1121 for patient S.C. when no such test/study was actually performed on patient S.C.

110. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicaid in the approximate amount $1121 for patient D.J.D. when no such test/study was actually performed on patient D.J.D.

111. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicaid in the approximate amount $1121 for patient L.G. when no such test/study was actually performed on patient L.G.

112. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicaid in the approximate amount $1055 for patient S.M.H. when no such test/study was actually performed on patient S.M.H.

113. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicaid in the approximate amount $1055 for patient L.K.M. when no such test/study was actually performed on patient L.K.M.

114. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicaid in the approximate amount $1121 for patient K.B. when no such test/study was actually performed on patient K.B.

115. In or about the month of August 2015, Defendants submitted, or caused to be submitted, a claim to Medicaid in the approximate amount $1055 for patient A.D.J. when no such test/study was actually performed on patient A.D.J.

## VII. FALSE CLAIMS REGARDING DRUG TESTING.

116. From in or about March 2015, until and including the present, CCHN, by and through its Management, knowingly engaged in a continuing policy, practice, and course of conduct to submit false claims to Medicare and Medicaid for the performance of drug testing that was medically unnecessary and/or that was never actually performed.

117. CCHN facilities perform an initial drug test on a patient's urine sample to determine the presence of controlled substances. This qualitative test will produce a binary result indicating whether any of a number of pre-determined controlled substances are present in the patient's sample. Quantitative testing, however, is designed to determine the specific controlled substance and the specific amount thereof in the patient's system. Unlike the qualitative testing, which simultaneously tests for the presence of many controlled substances, a separate quantitative test can also be conducted for many different controlled substance. Thus, multiple different tests, each separately billed to Medicare and Medicaid, can be administered if a patient sample is subject to the battery of quantitative testing, rather than a single qualitative test.

118. Defendant CCHN, by and through its Management, developed a plan to identify all patients within its "pain management" program and bill them for unnecessary office visits and

22

unnecessary drug testing. Specifically, all "pain" patients were split into 3 groups, Groups A, B, and C.

119. CCHN, by and through its Management, directed its employees to perform extensive and unnecessary drug testing on every "pain" patient every fiscal quarter. Specifically, CCHN directed that every patient in Group A be tested in January, April, July, and October; CCHN directed that every patient in Group B be tested in February, May, August, and November; CCHN directed that every patient in Group C be tested in March, June, and September, and December.

120. To get the "pain" patients into the CCHN facilities for these tests, CCHN directed its employees to contact each patient and order them to return to the office for a "pill count." Each return visit to the office was billed to the insurance provider, including Medicare and Medicaid, using CPT code 99211. The facility employees, without consulting all of the physician providers, would contact the patients and instruct them to return so their existing pain medication prescriptions could be checked, ostensibly to see if they were overusing their prescription medication.

121. Once the "pain" patient was in the office, CCHN directed that an initial qualitative test be performed. This test was locally performed in the respective CCHN facilities. The patient's urine sample was then sent to CCHN's laboratory at its head office in Statesville, North Carolina.

122. CCHN, by and through its Management, then directed that multiple separate quantitative tests be conducted on each patient's sample.

123. For this purpose, CCHN purchased and possesses its own mass spectrometry machine at its laboratory in Statesville, North Carolina.

Case 5:15-cv-00134-KDB-DCK   Document 2   Filed 11/05/15   Page 23 of 31

124.    CCHN would conduct quantitative testing on patient's urine samples using CPT codes 83789 (for mass spectrometry) and 82544 (for column chromatograph), as well as CPT codes; 80154 (an assay of Benzodiazepines); 83925 (an assay of opiates); 82145 (an assay of Amphetamines); 82520 (an assay of cocaine); 83840 (an assay of methadone); 83805 (an assay of meprobamate); and 83392 (an assay of PCP (phencyclidine)).

125.    Quantitative mass spectrometry testing was performed on patients' samples and billed to the insurance provider, including Medicare and Medicaid, <u>even if the preliminary qualitative test was negative for all controlled substances</u>.

126.    Quantitative mass spectrometry testing was performed on the patients' samples and billed to the insurance provider, including Medicare and Medicaid, when there was no medical necessity for multiple quantitative tests to be performed.

127.    CCHN would further direct its employees to "unbundle" the nursing visits (CPT code 99211) from the mass spectrometry testing billing by altering, in the claims for payment from Medicare and Medicaid, the dates that the testing was actually performed.

## VIII.    FALSE CLAIMS REGARDING MEDICARE WELLNESS VISITS

128.    In February 2015, CCHN, by and through its management, knowingly engaged in continuing policy, practice, and course of conduct to submit false claims to Medicare regarding the performance of Medicare Annual Wellness exams.

129.    In February 2015, Defendants developed a plan to perform a Medicare Annual Wellness exam on every single CCHN patient with Medicare. To this end, Defendants created spreadsheets of every Medicare patient and gave express instructions to its facility managers that every Medicare patient needed to be contacted and seen in March 2015.

130.   On February 2, 2015, Defendant Michael A. Smith sent an email to CCHN employees stating, "I need a plan of attack asap for this. . . . Brian [Gaskill] and I want to see an accounting for each patient being scheduled and when they will be seen and get this done over the next 30 to 45 days. We need the Revenue. Thanks."

131.   CCHN's list of Medicare Annual Wellness exams to be performed included more than 2200 patients.

132.   Medicare Annual Wellness exams must be provided by a qualified medical professional or an approved professional working under the direct supervision of qualified medical professional. If a Medicare Annual Wellness exam is not performed directly by a qualified medical professional or an approved professional working under the direct supervision of qualified medical professional it cannot be lawfully submitted for reimbursement.

133.   At the CCHN facility in Mount Airy, CCHN had LPNs (Licensed Practical Nurses) conduct Medicare Annual Wellness exams on the CCHN patients with Medicare, even though the LPNs conducting the examinations are neither qualified medical professionals nor were they actually working under the direct supervision of a qualified medical professional.

134.   CCHN instructed its facility managers to conduct Medicare Annual Wellness exams on every single CCHN patient with Medicare even though it knew that not all Medicare Annual Wellness exams could be performed by a qualified medical professional, or an approved professional working under the direct supervision of a qualified medical professional. Medicare patients at CCHN's multiple facilities were thus systemically seen by unqualified individuals.

135.   CCHN would then falsely certify in its claims to Medicare that the Medicare Annual Wellness exams were in fact conducted either by a qualified medical professional, or an approved professional working under the direct supervision of qualified medical professional.

25

## IX.   FALSE CLAIMS REGARDING TOBACCO CESSATION COUNSELING.

136.   Throughout 2015, CCHN, by and through its Management, knowingly engaged in a continuing policy, practice, and course of conduct to submit false claims to Medicare regarding the performance of Tobacco Cessation counseling.

137.   Nurses and employees were advised by CCHN, its management, and facility managers to add CPT codes 99406 and 99407 to patient charts regardless of whether Tobacco Cessation counseling of between 3 minutes and 10 minutes (CPT code 99406) or Tobacco Cessation counseling of more than 10 minutes (CPT code 99407) was actually conducted with the patient.

138.   CCHN then submitted false claims to Medicare and Medicaid indicating that they had performed $35 worth of Tobacco Cessation counseling to its patients.

139.   CCHN, by and through its Management, submitted, or caused to be submitted, more claims to Medicare and Medicaid for Tobacco Cessation counseling than could actually be accomplished in the workday.


### COUNT I
### VIOLATION OF THE FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(l)(A)

140.   Relators, the Majures, re-alleges paragraphs 1 – 139 as fully set forth herein,

141.   Through the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the United States under the Medicare and Medicaid Programs in violation of 31 U.S.C. § 3729(a)(1)(A).

142.   Because of the presentation of false or fraudulent claims, the United States reimbursed Defendants for services that it otherwise would not have.

26

143. By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

144. All of the Defendants' conduct described in this Complaint was knowing, as that term is used in the federal False Claims Act.

**COUNT II**
**VIOLATION OF THE FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. § 3729(a)(l)(B)**

145. Relators, the Majures, re-allege paragraphs 1 – 144 as fully set forth herein,

146. Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the United States under the Medicare and Medicaid Programs in violation of 31 U.S.C. § 3729(a)(1)(B).

147. Defendants made or caused to be made such false records and statements to Medicare and Medicaid, which were material to their false or fraudulent claims, to ensure that these programs would reimburse for services CCHN facilities provided to beneficiaries of these programs, whether or not they were medically necessary.

148. Defendants made or caused to be made such false records and statements to Medicare and Medicaid, which were material to their false or fraudulent claims, to ensure that these programs would pay CCHN facilities for services even if such services were not actually provided to any patients.

149. Because of Defendants' use of false records or statements, the United States reimbursed the Defendant for services that it otherwise would not have.

150. By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

27

151.    All of the Defendants' conduct described in this Complaint was knowing, as that term is used in the federal False Claims Act.


## COUNT III
## NORTH CAROLINA FALSE CLAIMS ACT, N.C. Gen. Stat. § 1-607(a)(1)

152.    Relators, the Majures, re-allege paragraphs 1 – 151 as fully set forth herein.

153.    Through the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of North Carolina under the Medicare and Medicaid Programs in violation of N.C.G.S. §§ 1-607(a)(1).

154.    Because of the presentation of false or fraudulent claims, the State of North Carolina reimbursed Defendants for services that it otherwise would not have.

155.    By reason of the Defendants' acts, the State of North Carolina has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

156.    The State of North Carolina is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.


## COUNT IV
## NORTH CAROLINA FALSE CLAIMS ACT, N.C. Gen. Stat. § 1-607(a)(2)

157.    Relators, the Majures, re-allege paragraphs 1 – 156 as fully set forth herein.

158.    Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the State of North Carolina under the Medicaid Program in violation of N.C.G.S. § 1-607(a)(2).

159. Because of Defendants' use of false records or statements, the State of North Carolina reimbursed Defendants for services that it otherwise would not have.

160. The North Carolina State Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal statements or records.

161. By reason of the Defendants' acts, the State of North Carolina has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

162. The State of North Carolina is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**WHEREFORE**, Relators, the Majures, request the following relief:

A.   Judgment against Defendants for three times the amount of damages the United States has sustained because of their actions, plus a civil penalty of $11,000 for each violation of the federal False Claims Act;

B.   Judgment against Defendants for three times the amount of damages the North Carolina Medicare and Medicaid programs have sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of North Carolina Gen. Stat. § 1-607;

C.   that 25% of the damages and penalties obtained as a result of this action if the United States or the State of North Carolina elects to intervene, and 30% if they do not;

D.   that the Majures' attorneys' fees, litigation and investigation costs, and expenses be paid by Defendants; and

29

E.     for such other relief as the Court deems just and appropriate.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a trial by jury.

This the 5th day of November, 2015.

Mark A. Jones
BELL, DAVIS & PITT, P.A.
Attorney for the Majures
North Carolina Bar # 36215
100 N. Cherry St, Suite 600
Winston-Salem, NC 27101
Phone:(336)714-4122
Facsimile:(336)714-4101
mjones@belldavispitt.com

Kevin G. Williams
BELL, DAVIS & PITT, P.A.
Attorney for the Majures
North Carolina Bar # 25760
100 N. Cherry St, Suite 600
Winston-Salem, NC 27101
Phone:(336)714-4122
Facsimile:(336)714-4101
mjones@belldavispitt.com

30

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Relators' *Qui Tam* Complaint for Violations of Federal and State False Claims Acts has been served on the following Via Federal Express:

The Honorable Loretta E. Lynch
U.S. Attorney General
950 Pennsylvania Ave. N.W.
Washington, DC 20530-0001
(202) 514-2001

Roy Cooper, North Carolina Attorney General
Attorney General's Office
9001 Mail Service Center
Raleigh, NC 27699-9001
(919) 881-2320

F. Edward Kirby, Jr., Esquire - Assistant Attorney General
North Carolina Department of Justice - Medicaid Investigations Unit, NC
5505 Creedmoor Road, Suite 300
Raleigh, NC 27612
(919) 881-2320

Jill Westmoreland Rose – Acting United States Attorney
United States Attorney's Office for the Western District of North Carolina
United States Department of Justice
227 West Trade Street, Suite 1650
Charlotte, NC 28202
(204) 344-6222

This the 5th day of November, 2015.

Mark A. Jones
BELL, DAVIS & PITT, P.A.
Attorney for the Majures
North Carolina Bar # 36215
100 N. Cherry St, Suite 600
Winston-Salem, NC 27101
Phone:(336)714-4122
Facsimile:(336)714-4101
mjones@belldavispitt.com

31